# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOHN & BETSY LEWITZKE,

        Plaintiffs,

      v.                            Case No. 03-C-1255

MILWAUKEE CARPENTERS' DISTRICT
COUNCIL HEALTH FUND,
JEFF DZIEDZIC, Trustee,
WILLIAM ROEHR, Trustee,
DAVE LOPEZ, Trustee,
ED HAYDEN, Trustee,
THOMAS LORENZ, Trustee, and
MICHAEL STEFFES, Trustee,

        Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. PROCEDURAL BACKGROUND

On November 12, 2003, the plaintiffs, John Lewitzke and Betsy Lewitzke ("Lewitzkes"), commenced this action when they filed a complaint naming as defendants the Milwaukee Carpenters' District Council Health Fund ("the Health Fund"), together with the trustees of the Health Fund, those being Jeff Dziedzic, William Roehr, Dave Lopez, Ed Hayden, Thomas Lorenz, and Michael Steffes ("the trustees"). Their complaint asserts three claims: (1) wrongful denial of benefits against the Health Fund; (2) breach of fiduciary duty against the trustees; and (3) estoppel against the Health Fund, all pursuant to the provisions of ERISA §§ 502(a)(1)(B), 502(a)(2), and 502(a)(3).

On December 8, 2003, the defendants filed their answer. On December 9, 2003, the defendants filed a motion for judgment on the pleadings seeking dismissal of Count II of the Complaint, i.e., the breach of fiduciary duty claim against the trustees individually. On February 13, 2004, the court denied the defendants' motion. Thereafter, the parties undertook discovery. On January 18, 2005, the defendants filed a motion for summary judgment, which is now fully briefed and is ready for resolution.

This court has jurisdiction over the action pursuant to ERISA § 502(e)(1), codified at 29 U.S.C. § 1132(e)(1). Venue is proper in this district under ERISA § 502(e)(2), codified at 29 U.S.C. § 1132(e)(2).

For the reasons which follow, the defendants' motion for summary judgment will be granted.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2, along with their motion for summary judgment, the defendants filed a set of Proposed Findings of Fact. Likewise, the plaintiffs filed responses to the defendants' proposed findings together with some additional proposed findings. Finally, the defendants filed a set of "responses" to the plaintiffs' responses, as well as responses to the plaintiffs' additional proposed findings. The court has reviewed the parties' respective submissions relative to the various proposed findings of fact. Except where noted otherwise, the following constitute the facts over which there seems to be no genuine dispute. Other material facts over which the court concludes there to be no genuine dispute (although the parties may not be willing to admit such to be the case) will be discussed in the analysis portion of this decision.

2

The Milwaukee Carpenters' District Council Health Fund (the "Fund") is a multi-employer, employee benefit trust organized and maintained under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.* (Defendants' Proposed Findings of Fact (DPFOF) ¶ 1.)

The Fund is not insured (self-funded), with the exception of the organ transplant insurance, and provides health and welfare benefits to eligible participants and their dependents. (DPFOF ¶ 2.)

The Fund is governed by a six member Board of Trustees. The plaintiffs object to the defendants' claimed failure to note that the "Fund" referred to in this paragraph is the Welfare Fund, and not the Health Fund, which latter fund, according to the plaintiffs, is not referenced in the Trust Agreement. However, on July 17, 1985, the Trust Agreement was amended to provide that "this Fund [the Welfare Fund] shall hereafter be known as the Milwaukee Carpenters District Council Health Fund and that the Plan Document and other papers and documents of the Fund be revised accordingly." Consequently, the court finds that the defendants' proposed finding of fact is correct. Moreover, to the extent that the plaintiffs object to any of the defendants' proposed findings of fact on that same ground, the plaintiffs' objections are overruled. (DPFOF ¶ 3 & Pls.' Resp. thereto; Trust Agreement at § 3.1, reproduced in Bulmer Aff. ¶10 Ex. I)

Three of the trustees represent employees who are members of local unions affiliated with the Milwaukee and Southern Wisconsin District Council of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, and the other three represent employers in the construction industry who have collective bargaining agreements with the local unions and who make required contributions to the Fund on behalf of these employees. (DPFOF ¶ 4.)

The trustees administer the Fund in accordance with a Trust Agreement. (DPFOF ¶ 5.)

3

The Trust Agreement authorizes the trustees to make rules and regulations necessary to administer the trust, provided the [rules and regulations] are not inconsistent with terms of the Trust Agreement. (DPFOF ¶ 6 & Pls.' Resp. thereto.)

The Trust Agreement authorizes the trustees to establish a plan to provide health and welfare benefits to union members and their families. (DPFOF ¶ 7.)

Although the plaintiffs argue otherwise, the Trust Agreement authorizes the trustees to be the final authority in disputes about benefits. (DPFOF ¶ 8 & Pls.' Resp. thereto.)

Although the plaintiffs argue otherwise, the Trust Agreement authorizes the trustees to interpret conclusively the terms of the Agreement and Plan to determine all questions of coverage and eligibility for benefits. (DPFOF ¶ 9 & Pls.' Resp. thereto.)

Section 5.18 of the Trust Agreement provides in part that:

> Subject to the stated purposes of the Fund and the provisions of this Agreement, the Trustees shall have full and exclusive authority to determine all questions of coverage and eligibility, methods of providing or arranging for benefits and all other related matters. They shall have full power to construe the provisions of this Agreement, the terms used herein and the by-laws and regulations issued thereunder. Any such determination and any such construction adopted by the Trustees in good faith shall be binding upon all of the parties hereto and the Beneficiaries hereof.

(DPFOF ¶ 10.)

Section 6.2 of the Trust Agreement provides in part that:

> All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Trust Fund or the operation thereof, whether as to any claim for any benefits preferred by any Participant, Beneficiary or any other person, or whether as to the construction of the language or meaning of the by-laws, rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund or otherwise, shall be submitted to the Trustees or, in the case of questions related to claims for benefits, to an Appeals or Review Committee, if one has been appointed, and the decision of the Trustees or Appeals

4

or Review Committee shall be binding upon all persons dealing with the Trust Fund or claiming benefits thereunder.

(DPFOF ¶ 11.)

Section 6.3 of the Trust Agreement provides that:

The Trustees may in their sole discretion compromise or settle any claim or controversy in such manner as they think best, and any majority decision made by the Trustees in compromise or settlement of a claim or controversy, or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties interested in this Trust.

(DPFOF ¶ 12.)

The Plan Year means the twelve months beginning any June 1st and ending the following May 31st. (DPFOF ¶ 13.)

The Trust Fund created a benefit plan in 1976. (DPFOF ¶ 14.)

The Fund's benefit plan was restated in 1990 and again in 2000. (DPFOF ¶ 15.)

The health benefit plan set up by the Fund covers medically necessary services or supplies. (DPFOF ¶ 16.)

All claims received by the Fund Office, whether submitted by a provider of the services or by the participant and/or their dependent must be medically necessary, pursuant to the definitions outlined in the Plan and the Summary Plan Description, or the Fund cannot pay the claim. (DPFOF ¶ 17.)

Section 5.4(e) of the Plan states, in part, the following:

(e)     Covered Expenses

Benefits are payable for Reasonable Expenses incurred by an Eligible Person for the following services and supplies when Medically Necessary for the treatment of an Injury or Sickness.

5

. . . .

(7)     Other covered expenses include the following:

. . . .

(ii)     Services of a licensed physiotherapist, occupational therapist, speech therapist, registered nurse (R.N.), or licensed practical nurse (L.P.N.) except for services provided by a person who ordinarily resides in the Eligible Person's home or is a member of the Eligible Person's immediate family (comprised of the Eligible Person's spouse and the Children, brothers, sisters, and parents of such Eligible Person or Eligible Person's spouse).

(iii)    Local professional ambulance service between Hospitals as well as to and from a Hospital if the attending Physician considers it Medically Necessary for proper treatment.

(DPFOF ¶ 18.)

Section 1.20 of the Plan states the following:

1.20     Medically Necessary

As used herein, "Medically Necessary" means a service or supply which:

(a)     is appropriate and consistent with the diagnosis of an Injury or Sickness in accordance with accepted standards of community practice; and
(b)     could not have been omitted without adversely affecting the person's condition or the quality of medical care.

(DPFOF ¶ 19.)

Section 7.1 of the Plan Document states the following:

The Plan shall be administered solely by the Trustees and decisions of the Trustees in all matters pertaining to Plan administration shall be final. Employees and agents of the Trustees shall act as authorized by the Trustees.

The Board of Trustees, or an authorized Committee thereof, may approve Plan coverage of otherwise noncovered services which have been recommended by the

6

utilization review firm to accomplish effective medical case management. The Board, or the Committee, shall examine each such claim on a case-by-case basis.

(DPFOF ¶ 20.)

Pursuant to Amendment 5 to the Plan Document, Section 7.2 of the Plan stated the following:

(a)     Benefits under this Plan shall be paid only if the Board of Trustees (or its Plan Administrator) decides in its (his) discretion that the applicant is entitled to them.

(b)     The Plan shall be interpreted and applied in the sole discretion of the Board of Trustees (or its delegate, including but not limited to, its Plan Administrator) and such decision shall be final and binding upon all persons and Participants covered by the Plan who are claiming any benefits under the Plan.

The Plaintiffs dispute that Amendment 5 to the Plan Document became effective on April 1, 2001.

(DPFOF ¶ 21 & Pls.' Resp. thereto.)

At the time of the Lewitzkes' claims, Section 7.3 of the Plan stated in part the following:

7.3     Claims Procedure

(a)     Notice of Claim

(1)     Notice of Injury or Sickness upon which request for benefit payment is to be based must be given to the Trustees, or to the Administrative Manager or other authorized agent, within ninety (90) days of the date of the commencement of each such Injury or Sickness, or as soon thereafter as is reasonably possible. Such notice shall be given by or on behalf of the Eligible Person with particulars sufficient to identify the Eligible Person. Such notice given to authorized agents of the Trustees shall be deemed to be notice to the Trustees. . . .

According to the plaintiffs, Section 7.3(c) further stated, inter alia, that "[t]he determination of the type of benefits payable, if any, and the amount of benefits payable shall be the function and responsibility of the Administrative Manager named by the Trustees." (DPFOF ¶ 22 & Pls.' Resp. thereto.)

7

At the time of the Lewitzkes' claims, Section 7.4 of the Plan stated in relevant part the following:

7.4    <u>Benefit Appeals Procedure</u>

(a)    When, for any reason, a claim is denied, in whole or in part, the Administrative Manager, within not more than ninety (90) days [or within one hundred eighty (180) days under special circumstances] after the claim is received, shall provide the claimant with a written notice containing the following information:

    (1)    the specific reason(s) why the claim or a portion of it was denied;

    (2)    reference to pertinent Plan provisions on which the denial was based;

    (3)    what additional information, if any, is required to perfect the claim and why the information is necessary; and

    (4)    what steps may be taken to appeal the decision.

If the claimant feels that the action taken on his eligibility or claim is incorrect, the claimant immediately should ask the Fund Office to review the claim with him. In some cases, the Fund Office may request additional information which might enable the Fund Office to reevaluate its decision.

(b)    If after review by the Fund Office, the claimant still does not agree with the action taken on the claim, the claimant has the right to appeal to the Board of Trustees (or a committee of the Trustees) for further review. The procedure for appealing to the Trustees is as follows:

    (1)    Within sixty (60) days after receipt of a notice denying a claim which the Employee feels is incorrect, the Employee must notify the Fund Office in writing that he:

        (I)    wishes to have his claim reviewed by the Board of Trustees (or a committee of the Trustees); or

        (ii)    wishes to have a hearing before the Board of Trustees (or a committee of the Trustees).

    (2)    The Employee's written request for review or hearing should include all information regarding his claim as well as the reason(s) he feels the original decision was

8

incorrect. Upon request, the Fund Office shall assist the Employee in gathering any information from Fund records which he feels might help support the claim to be presented to the Board of Trustees. Copies of any Participant records regarding the claim shall be provided to the Employee, at no cost, upon request.

>   (3)   In the event the Employee requests a hearing, he can apply in person or can choose a representative to appear for him before the Board of Trustees (or a committee of the Trustees as determined by the Board).

>   (4)   If the Employee does not wish to make a personal appearance before the Board of Trustees, the Administrative Manager shall present the Employee's written statement and other pertinent information in his behalf.

>   (5)   The Trustees, who generally meet not less often than every other month, shall act on the Employee's request for review by a majority vote and shall notify the Employee of their decision within sixty (60) days after receipt of written request for a review or within one hundred twenty (120) days of the Employee's written request for a hearing.

>   (6)   The Employee shall receive the Trustees' decision in writing. The decision shall include:
>     (i)   the reasons for the decision; and
>     (ii)  reference to specific Plan provisions on which the decision is based.

(DPFOF ¶ 23.)

The Lewitzkes were provided a Summary Plan Description that described the health care benefits provided by the Plan and instructions for submitting claims. (DPFOF ¶ 24.)

The Summary Plan Description states: "[w]hen you or your dependent require covered services or supplies which are medically necessary because of injury or sickness, benefits are payable as stated in the Schedule of Benefits, provided you have satisfied any required deductible." (DPFOF ¶ 25.)

9

On page 5 of the Summary Plan Description under "HOW TO APPLY TO RECEIVE BENEFITS" it states: "This Plan is designed to furnish you and your family with the kind of health care protection you are most likely to need, when you need it, but the payment of benefits is not automatic." (DPFOF ¶ 26.)

On page 49 of the Summary Plan Description it states the Fund's claims review and appeal procedures, which were in effect when the Lewitzkes' filed their claims and appeal in 2001 and 2002:

> CLAIMS REVIEW AND APPEAL PROCEDURES
> When you submit a claim for benefits, the Fund's claims administrator will determine if you are eligible and will calculate the amount of benefit payable, if any.
> If for any reason your claim is denied, in whole or in part, the claims administrator will, within not more than 90 days (or within 180 days under special circumstances) after your claim is received, provide you with a written notice containing the following information:
> - the reason(s) why your claim or a portion of it was denied;
> - reference to Plan provisions on which the denial was based;
> - what additional information, if any, is required to perfect your claim and why the information is necessary; and
> - what steps may be taken if you wish to appeal the decision.
> If you feel that the action taken on your eligibility or claim is incorrect, you immediately should ask the Fund Office to review your claim with you. In some cases, the Fund Office may request additional information from you which might enable the Fund Office to reevaluate its decision.

(DPFOF ¶ 27.)

On page 47 of the Summary Plan Description it states the following: "Itemized bills and claims should be submitted directly to the Fund Office within 90 days after expenses are incurred, if possible, but in no event later than one year from the date of service." (DPFOF ¶ 28.)

On page 47 of the Summary Plan Description under the heading "Avoid Unnecessary Delays In Processing Your Claims By Providing All Necessary Information" it states the following:

> A major reason for delays in processing of benefits is failure on the part of the providers furnishing supplies or services and the person filing for benefits to provide

10

all the necessary information as specified. You probably would not be aware of the information omitted by your physician; however, a reminder to the receptionist or nurse in the physician's office that such information is important may help to solve the problem.

(DPFOF ¶ 29.)

As a general practice of the Health Fund, when a claim for benefits is submitted to the Fund for adjudication, a Claims Examiner, employed by Carday Associates, Inc., enters the claim into the computer. (DPFOF ¶ 30 & Pls.' Resp. thereto.)

Carday Associates, Inc. is the Fund's Administrative Manager. (DPFOF ¶ 31.)

The primary role for review of claims submitted to the Fund has been delegated to the Administrative Manager. (DPFOF ¶ 32.)

The next step for the Claims Examiner is to determine if the participant or beneficiary is eligible and whether the claim submitted is payable under the provisions of the Milwaukee Carpenters' District Council Health Fund Plan Document ("Plan"). This is according to the Summary Plan Description. (DPFOF ¶ 33 & Pls.' Resp. thereto.)

The Claims Examiner will also calculate the amount of benefit payable, if any. The Summary Plan Description states that this is the general practice of the Health Fund. (DPFOF ¶ 34 & Pls.' Resp. thereto.)

In order for a claim to be payable, the claim must be an allowable benefit under the Plan and the claim for benefits must be medically necessary as defined in the Plan and SPD. (DPFOF ¶ 35.)

A Claims Examiner refers to the language in the Plan Document and Summary Plan Description Document to determine whether the benefits outlined in the claim are covered. This is the general practice of the Health Fund. (DPFOF ¶ 36.)

11

A Claims Examiner refers to Carday's suggested guidelines for processing. (DPFOF ¶ 37.)

Innovative Resource Group bought CNR which is referred to in the guidelines. (DPFOF ¶38.)

The CNR guidelines are only to be used to authorize payment of benefits and the guidelines are merely a brief synopsis of claims which arise more frequently than others. (DPFOF ¶ 39.)

According to CNR's suggested guidelines, number 2 under in-network or out-of-network providers, 10 PT visits (home or outpatient) combined, per medical episode (such as hamstring lengthening surgery) are automatically considered medically necessary. (DPFOF ¶ 40.)

The CNR guidelines thus suggest that any physical therapy visits after ten should be clinically assessed and reviewed for medical necessity before any services are denied. (DPFOF ¶ 41.)

In the event there is the potential for a claim to be denied, a Claims Examiner does not determine medical necessity; thus, all such claims are sent to the Fund's Case Manager, who has the requisite medical background. (DPFOF ¶ 42 & Pls.' Resp. thereto.)

Before the Claims Examiner can send the claim to the Case Manager, the claim and all relevant medical records must be attached to the claim. (DPFOF ¶ 43.)

If the relevant medical records are not submitted with the claim, the Claims Examiner attempts to obtain the medical records from the provider of services. This is the general practice of the Health Fund. (DPFOF ¶ 44 & Pls.' Resp. thereto.)

A provider is sent at least two letters requesting the medical information needed for the Case Manager to review for medical necessity. This is the general practice of the Health Fund. (DPFOF ¶ 45 & Pls.' Resp. thereto.)

A Claims Examiner will also telephone providers to request the needed information. This is the general practice of the Health Fund. (DPFOF ¶ 46 & Pls.' Resp. thereto.)

If the service provider fails to respond to the letters and telephone inquiries, a third letter, a denial letter, is sent to the provider and the participant which sets forth that the claim request is being denied because no response has been received and the letter also requests the needed information. This is the general practice of the Health Fund. (DPFOF ¶ 47 & Pls.' Resp. thereto.)

Every claim where additional relevant medical evidence is needed to adjudicate the claim is handled in this procedure. This is the general practice of the Health Fund. (DPFOF ¶ 48 & Pls.' Resp. thereto.)

If a claim and the relevant medical information is sent to the Case Manager and the Case Manager determines that the definition of medically necessary under the terms of the Plan is not met, the Case Manager makes a recommendation to deny the claim and a Claims Examiner follows through on the Case Manager's recommendation. This is the general practice of the Health Fund. (DPFOF ¶ 49 & Pls.' Resp. thereto.)

If for any reason a participant's claim is denied, in whole or in part, the Claims Examiner will, within not more than 90 days (or within 180 days, under special circumstances) after the participant's claim is received, provide the participant with a written notice containing the information outlined on page 49 of the Summary Plan Description. This is the general practice of the Health Fund according to the Summary Plan Description. (DPFOF ¶ 50 and Pls.' Resp. thereto.)

In some cases, the Fund Office may request additional information from the participant which might enable the Fund Office to reevaluate its decision. This is the general practice of the Health Fund according to the Summary Plan Description. (DPFOF ¶ 51 and Pls.' Resp. thereto.)

13

A Claims Examiner, the Office Manager, or Mary Jane De Battista (all of Carday Associates, Inc.) could all possibly determine whether a claim for benefits should or should not be paid. This is the general practice of the Health Fund. (DPFOF ¶ 52 & Pls.' Resp. thereto.)

If a Claims Examiner has a question regarding a claim for benefits, the Claims Examiner may refer the claim to the Office Manager. This is the general practice of the Health Fund. (DPFOF ¶ 53 & Pls.' Resp. thereto.)

If the Office Manager has a question regarding a claim for benefits, the Office Manager may refer the claim to Mary Jane De Battista. This is the general practice of the Health Fund. (DPFOF ¶ 54 & Pls.' Resp. thereto.)

In the event a participant (and/or a dependant) appeals a claim, the Board of Trustees becomes involved in the claims review procedures. This is the general practice of the Health Fund according to the Summary Plan Description. (DPFOF ¶ 55 & Pls.' Resp. thereto.)

The Board of Trustees ultimately decides whether an appeal is granted or denied. (DPFOF ¶ 56 & Pls.' Resp. thereto.)

Participants have within 60 days after they receive a notice denying a claim to notify the Fund Office in writing that they (1) wish to have their claims reviewed by the Board of Trustees (or a committee of the Trustees); or (2) wish to have a hearing before the Board of Trustees (or a committee of the Trustees). (DPFOF ¶ 57.)

The written request for review or hearing should include all information regarding the participant's claim as well as the reason(s) the participant feels the original decision was incorrect. (DPFOF ¶ 58.)

Upon request, the Fund Office will assist in gathering any information from Fund records which participants feel might help support their claims. This is the general practice of the Health Fund according to the Summary Plan Description. (DPFOF ¶ 59 & Pls.' Resp. thereto.)

Copies of participants' records regarding their claims will be provided to the participant, at no cost, upon request. This is the general practice of the Health Fund according to the Summary Plan Description. (DPFOF ¶ 60.)

The Board of Trustees will not review the claim on appeal until all relevant information is included with the claim. This is the general practice of the Health Fund. (DPFOF ¶ 61 & Pls.' Resp. thereto.)

In the event a participant requests a hearing, the participant can appear in person or can choose a representative to appear on behalf of the participant before the Board of Trustees (or a committee of the Trustees as determined by the Board). This is the general practice of the Health Fund. (DPFOF ¶ 62 & Pls.' Resp. thereto.)

If the participant does not wish to make a personal appearance before the Board of Trustees, the Administrative Manager will present the participant's written statement and other pertinent information on the participant's behalf. This is the general practice of the Health Fund. (DPFOF ¶ 63 & Pls.' Resp. thereto.)

The Board of Trustees will act on the participant's request for review by a majority vote and will notify the participant of their decision within 60 days after receipt of the participant's written request for review or within 120 days after receipt of the participant's written request if a hearing is requested. This is the general practice of the Health Fund. (DPFOF ¶ 64 & Pls.' Resp. thereto.) The participant will receive the trustees' decision in writing. The decision will include: (1) the reasons

15

for the decision; and (2) reference to specific Plan provisions on which the decision is based. This is the general practice of the Health Fund according to the Summary Plan Description. (DPFOF ¶ 65 & Pls.' Resp. thereto.)

John Lewitzke is a participant under the Fund's health Plan, and Betsy Lewitzke, his spouse, and Brenda Lewitzke, his daughter, are both dependents under the terms of the Plan. (DPFOF ¶ 66.)

Brenda Lewitzke was born on May 22, 1988, and was diagnosed with cerebral palsy at 1-1/2 years of age. (DPFOF ¶ 67.)

In December of 2000, the Fund Office received a call from the Lewitzkes' provider, St. Francis Hospital, to ask for preauthorization of an evaluation and for physical therapy sessions regarding Brenda Lewitzke. (DPFOF ¶ 68.)

The Fund authorized an evaluation plus eight physical therapy sessions for Brenda Lewitzke for her knee. (DPFOF ¶ 69.)

A note is written on a document by an employee of St. Francis Hospital which states: "8 visits after that we need to fax script & eval notes Rhonda." (DPFOF ¶ 70.)

Rhonda Mohr is a Claims Examiner in the Fund Office who authorized the eight visits in December of 2000. (DPFOF ¶ 71.)

The Fund covered Brenda Lewitzkes' physical therapy for general knee pain between December of 2000 and February of 2001. (DPFOF ¶ 72.)

Brenda Lewitzke underwent surgery, and the Fund paid for covered surgery-related expenses, which Brenda Lewitzke incurred in March of 2001. (DPFOF ¶ 73.)

16

On May 16, 2001, the Fund Office received a claim from the Lewitzkes' Provider, St. Francis Hospital, on behalf of the Lewitzkes for five (5) physical therapy sessions and an evaluation all of which occurred in April of 2001.  (DPFOF ¶ 74.)

The evaluation and the five physical therapy sessions were paid by the Fund in May of 2001. (DPFOF ¶ 75.)

On May 17, 2001, the Fund Office sent an "Explanation of Benefits" to John Lewitzke regarding physical therapy services between April 6, 2001, and April 26, 2001, indicating the claims were paid.  (DPFOF ¶ 76.)

On June 21, 2001, the Fund Office received a claim from the Provider on behalf of the Lewitzkes for eight physical therapy sessions incurred in the month of May, 2001.  (DPFOF ¶ 77.)

The additional eight physical therapy sessions incurred in May of 2001, were paid on July 16, 2001. (DPFOF ¶ 78.)

In the Fund's "Claim File Maintenance - Inquiry" dated July 16, 2001, it states that eight visits were billed and that "ANY FUTURE PHYSICAL THERAPY VISITS WILL REQUIRE AN UPDATED PLAN OF CARE ALONG WITH WRITTEN REQUEST FOR AUTHORIZATION OF ANY FUTURE VISITS."  (DPFOF ¶ 79.)

On or about July 17, 2001, the Fund sent an "Explanation of Benefits" to John Lewitzke regarding physical therapy services between May 1, 2001, and May 31, 2001, indicating the claims were paid.  (DPFOF ¶ 80.)

In the section entitled "CLAIM COMMENTS" on the July 17, 2001, "Explanation of Benefits," it stated: "ANY FUTURE PHYSICAL THERAPY VISITS WILL REQUIRE AN

17

UPDATED PLAN OF CARE ALONG WITH WRITTEN REQUEST FOR AUTHORIZATION OF ANY FUTURE VISITS."  (DPFOF ¶ 81.)

On July 18, 2001, the Fund Office received a claim from the Provider on behalf of the Lewitzkes for physical therapy sessions incurred between June 5, 2001, and June 28, 2001.  (DPFOF ¶ 82.)

The claim for sessions incurred between June 5, 2001 and June 28, 2001, was pended because office notes, doctor's prescription, PT evaluation, and plan of care were needed so the claim could be reviewed for medical necessity.  (DPFOF ¶ 83.)

The Fund Office eventually paid claim for sessions incurred between June 5, 2001 and June 28, 2001, after the requested information came in.  This claim is not at issue in this lawsuit.  (DPFOF ¶ 84.)

On July 26, 2001, a letter and an EOB (Explanation of Benefits) attached to the letter was sent to St. Francis Hospital, the Lewitzkes' service provider, requesting office notes, doctor's prescription, PT evaluation, and a plan of care so the claim for services between June 5, 2001, and June 28, 2001, could be reviewed for medical necessity.  (DPFOF ¶ 85.)

On August 15, 2001, a letter and an EOB (Explanation of Benefits) attached to the letter was sent to St. Francis Hospital, the Lewitzkes' service provider, requesting office notes, doctor's prescription, PT evaluation, and a plan of care so the claim for services between June 5, 2001, and June 28, 2001, could be reviewed for medical necessity.  (DPFOF ¶ 86.)

It stated on the EOB dated July 26, 2001, that "NO PAYMENT WILL BE PAID UNTIL RESPONSE IS RECEIVED."  (DPFOF ¶ 87.)

18

It stated on the EOB dated August 15, 2001, that "NO PAYMENT WILL BE PAID UNTIL RESPONSE IS RECEIVED." (DPFOF ¶ 88.)

The letter sent with the EOB dated July 26, 2001, stated in pertinent part that: "before benefits can be considered the office notes for this claim are needed for review. Once this information is received, a review of this claim to determine benefits can be completed." (DPFOF ¶ 89.)

The letter sent with the EOB dated August 15, 2001, stated in pertinent part that: "before benefits can be considered the office notes for this claim are needed for review. Once this information is received, a review of this claim to determine benefits can be completed." (DPFOF ¶ 90.)

On August 17, 2001, the Fund Office received a claim from the Lewitzkes' Provider, St. Francis Hospital, on behalf of the Lewitzkes for physical therapy sessions incurred between July 2, 2001 and July 24, 2001. (DPFOF ¶ 91.)

The claim for sessions incurred between July 2, 2001, and July 24, 2001, was pended because office notes, doctor's prescription, PT evaluation, and plan of care were needed so the claim could be reviewed for medical necessity. (DPFOF ¶ 92.)

The Fund Office eventually paid the claim for sessions incurred between July 2, 2001 and July 24, 2001 after the information came in. This claim is not at issue in this lawsuit. (DPFOF ¶ 93.)

Because the Fund Office still had not received a response from St. Francis Hospital despite several attempts, on or about September 5, 2001, the Fund sent an "Explanation of Benefits" to John Lewitzke regarding physical therapy sessions between June 5, 2001, and June 28, 2001. (DPFOF ¶ 94.)

19

The EOB dated September 5, 2001, stated the following: "THE ELIGIBLE AMOUNT REFLECTS THE HCN CONTRACT RATE. YOU ARE RESPONSIBLE FOR AMOUNT SHOWN IN THE MEMBER BALANCE COLUMN. THIS CLAIM IS BEING DENIED BECAUSE NO RESPONSE HAS BEEN RECEIVED FROM LETTERS PREVIOUSLY SENT. REFER TO THE CLAIM APPEAL PROCEDURE. NO PAYMENT WILL BE PAID UNTIL RESPONSE IS RECEIVED." (DPFOF ¶ 95.)

In the section entitled "CLAIM COMMENTS" on the EOB dated September 5, 2001, it stated: "PLEASE SEND DRS RX, PT EVALUATION AND PLAN OF CARE. PT MUST BE REVIEWED FOR MEDICAL NECESSITY." (DPFOF ¶ 96.)

On September 13, 2001, the Fund Office closed any outstanding claim requests because the Fund Office still had not received office notes, doctor's prescription, PT evaluation, and plan of care from either St. Francis Hospital (the Lewitzkes' Provider) or the Lewitzkes. (DPFOF ¶ 97.)

On September 18, 2001, the Fund Office received a claim from the Provider on behalf of the Lewitzkes for physical therapy sessions incurred between August 2, 2001 and August 30, 2001. (DPFOF ¶ 98.)

On September 19, 2001, Betsy Lewitzke brought in the medical records relating to Brenda Lewitzke except the physical therapy records for physical therapy sessions on September 13, 2001, and September 18, 2001. (DPFOF ¶ 99.)

On September 19, 2001, the Fund Office sent the medical records obtained from the Lewitzkes relating to Brenda Lewitzke to Innovative Resource Group, the Fund's Case Manager. (DPFOF ¶ 100.)

The Fund's Case Manager was asked to "[p]lease review physical therapy for medical necessity. She [Brenda] had medical hamstring lengthening surgery on 3-27-01. Contact Erin L. at 414-647-7670." (DPFOF ¶ 101.)

The Fund's Case Manager employed by Innovative Resource Group was Susan Spangler, a licensed physical therapist since 1975 who has worked in the physical therapy field in Wisconsin for over 20 years and who received her Bachelor of Science in physical therapy from Northwestern University Medical School. (DPFOF ¶ 103.)

On or about October 1, 2001, the Fund Office received the report from Innovative Resource Group. (DPFOF ¶ 104.)

In her report, Susan Spangler stated that she reviewed the available therapy records very carefully which included the physician orders, an initial physical therapy evaluation, a therapy progress summary following 15 initial visits and daily progress notes for visits 19 through 47. (DPFOF ¶ 105.)

Susan Spangler, the Fund's Case Manager, spoke with David Passinault, Brenda Lewitzkes' physical therapist to establish if skilled therapy was continuing and to discuss any indications for continued interventions, i.e., continued physical therapy sessions. (DPFOF ¶ 106.)

Susan Spangler, the Fund's Case Manager, concluded that:

Based on review of all documentation and discussion with Brenda's primary physical therapist, skilled physical therapy intervention appeared to be indicated for up to 40 total visits. Following Brenda's 40th visit, documentation failed to establish any further functional or objective improvements. As of this visit, Brenda's home exercise program appeared to be fully established and her gross motor function appeared to plateau. A recommendation for foot orthotics was noted at the time of her 37th visit, though further documentation of this recommendation was noted until her 47th visit on 09/11/01. Though foot orthotics may improve Brenda's gait pattern, the continuation of on-going physical therapy visits up to an additional 16 visits did

21

not appear to be indicated for the purpose of implementing their use. . . . Case management recommends that any claims for physical therapy through the time of Brenda's 40th visit on 08/03/01 be considered for reimbursement as these services appeared to have been indicated. Any claims received after this date should be carefully considered as they do not appear to meet plan guidelines for reimbursement.

(DPFOF ¶ 107.)

Susan Spangler, the Fund's Case Manager, also concluded that since initiating physical therapy treatment, Brenda Lewitzke had achieved essentially normal range of motion at her lower extremities, her functional gait skills had improved from previous reliance on wheeled walker use to her current ability and more importantly that Brenda had been instructed in and continues to successfully perform an independent home exercise program with the support of family members. (DPFOF ¶ 108.)

On or about October 4, 2001, the Fund Office sent a letter to the Sports Performance Center and to John Lewitzke explaining that coverage was approved for submitted physical therapy claims for sessions 1 through 40. (DPFOF ¶ 110.)

The letter dated October 4, 2001, from the Fund Office to the Sports Performance Center and to John Lewitzke states, among other things:

Our case manager has reviewed all medical records that were sent to our office and approved coverage of physical therapy through the time of Brenda's 40th visit. Following Brenda's 40th visit, documentation failed to establish any further functional or objective improvements. The case manager also noted that Brenda's home exercise program appeared to be fully established and her gross motor function appeared to plateau. These visits should have been pre-authorized. Medical records requests were made to St. Francis Hospital on 7-18-01 and 8-15-01 with no response. Please note that any further physical therapy will require prior authorization. This is not a guarantee of payment. Payment of claims is subject to all plan provisions.

(DPFOF ¶ 111 & Pls.' Resp. thereto.)

22

The Fund paid for forty (40) visits relating to physical therapy for Brenda Lewitzke during the period commencing after her surgery in March of 2001 up until and including her 40th visit which was on August 3, 2001. According to the Lewitzkes, they received statements from St. Francis Hospital after the trustees' denial of their appeal which show that charges for an August 2, 2001 visit (which they presume to be the August 3, 2001 visit listed as visit 40 in Brenda' medical records) were not paid by the Health Fund. The defendants agree that no therapy session occurred on August 2, 2001, and thus the Fund could not pay for such charges. (DPFOF ¶ 112 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

The Fund did not pay for eight physical therapy sessions between August 2, 2001 and September 18, 2001. According to the plaintiffs, there were actually ten sessions during that time period for which the Fund did not pay. The Fund agrees. However, the Fund maintains that, as to those two additional sessions (August 2, 2001, and September 13, 2001), according to the medical records submitted by the Lewitzkes, there were no sessions on those dates; in other words, they are not documented. Thus, the Fund could not pay for those two dates. (DPFOF ¶ 113 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

There is no rule in any Plan documents that automatically cuts off coverage for physical therapy at the 40th visit. (DPFOF ¶ 114.)

On October 9, 2001, the Fund Office received a claim from the Lewitzkes' Provider, St. Francis Hospital, on behalf of the Lewitzkes for physical therapy sessions incurred between July 30, 2001, and July 31, 2001. (DPFOF ¶ 115.)

The Fund Office eventually paid the claim for sessions incurred between July 30, 2001, and July 31, 2001. This claim is not at issue in this lawsuit. (DPFOF ¶ 116.)

On October 12, 2001, the Fund Office received a claim from the Lewitzkes' Provider, St. Francis Hospital, on behalf of the Lewitzkes for physical therapy sessions incurred between September 4, 2001 and September 18, 2001.  (DPFOF ¶ 117.)

On October 17, 2001, an Explanation of Benefits ("EOB") was sent to John Lewitzke which stated: "OUR CASE MANAGER REVIEWED PT RECORDS.  OUR CASE MANAGER APPROVED PT THROUGH 8-03-01.  ALL VISITS AFTER THAT DATE ARE BEING REJECTED AS NOT MEDICALLY NECESSARY."  (DPFOF ¶ 118.)

The Fund Office received communications from Dr. Brian Black dated October 19, 2001, and from David Passinault dated October 18, 2001.  (DPFOF ¶ 119.)

On or about October 24, 2001, the Lewitzkes filed an appeal with the Board of Trustees of the denial of benefits for certain physical therapy expenses.  (DPFOF ¶ 120.)

In the Lewitzkes' appeal letter dated October 24, 2001, the Lewitzkes raised the following two issues, as identified in two of the four headings of the letter: "Why Benefits Through 9/18/01 Should be Covered" and "Why the Need for Additional Therapy."  (DPFOF ¶ 121 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

The request by the Lewitzkes for additional therapy is not at issue in this present case. (DPFOF ¶ 122.)

In a letter to the Fund Office dated January 31, 2002, which enclosed the complete medical records for Brenda Lewitzke, John Lewitzke stated in the letter: "At this point, we are not necessarily looking for authorization for further physical therapy visits."  (DPFOF ¶ 123.)

24

The only issue Plaintiffs asked the trustees to review on appeal was whether benefits through September 18, 2001 should be covered. The appeal letter also requested additional physical therapy. (DPFOF ¶ 124 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

On October 29, 2001, following the October 17, 2001 EOB sent to John Lewitzke, the Fund Office paid for physical therapy sessions between July 2, 2001, and July 24, 2001, and between June 5, 2001, and June 28, 2001. (DPFOF ¶ 125.)

On November 1, 2001, Sandra Belot wrote a memorandum to Angela De Battista, the Claims Examiner, stating the following: "Before I can complete the review on this appeal I will need the following information: 1. Physical therapy records for 9/13/01 & 9/18/01 2. Are all pt visits paid through 8/3/01." (DPFOF ¶ 126.)

On or about November 5, 2001, the Fund Office faxed and mailed an original request to Erin L. at Sports Performance Center asking for physical therapy notes for September 13, 2001, September 18, 2001, and any subsequent visits. (DPFOF ¶ 127.)

On November 8, 2001, an EOB was sent to John Lewitzke which explained the Fund's payment of physical therapy services for July 30, 2001, through July 31, 2001. (DPFOF ¶ 128.)

On November 8, 2001, an EOB was sent to John Lewitzke which explained the Fund's nonpayment of physical therapy services for August 2, 2001, through August 30, 2001, because these services were found to be not medically necessary by the Fund's Case Manager. (DPFOF ¶ 129 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

On December 11, 2001, John Lewitzke called Angela De Battista, the Fund's Claims Examiner, regarding status of physical therapy claims. (DPFOF ¶ 130.)

The Fund's telephone log for December 11, 2001, when John Lewitzke called Angela De Battista states the following:

> MR LEWITZKE RE STATUS OF PT - HE STATES THAT NOTES WERE WALKED IN HERE. I TOLD HIM THAT IS TRUE BUT THERE WERE TWO SPECIFIC DATES THAT WERE MISSING WE SENT A FAX TO ERIN AT SPORTS PERFORMANCE CENTER I WANT TO SAY 11-09-01 AND HAVE NOT HEARD BACK I CALLED SPORTS PERFORMANCE CENTER TO SPEAK WITH ERIN ABOUT TWO WEEKS AGO AND LEFT A DETAILED MESSAGE THAT WE NEEDED A RESPONSE TO OUR FAX AND THE MED RECORS TO COMPLETE A CLAIMS REVIEW. WE HAVE RECVD NOTHIGN TO DATE..."

(DPFOF ¶ 131.)

On December 21, 2001, the Fund Office faxed and mailed another request to Erin L. at Sports Performance Center asking for physical therapy notes for September 13, 2001, September 18, 2001, and any subsequent visits. (DPFOF ¶ 132.)

On two separate occasions, Angela De Battista, the Fund's Claims Examiner, called Erin L. at Sports Performance Center. (DPFOF ¶ 133.)

Both times Angela De Battista was told Erin was away from her desk but a person in the office took a message with Angela De Battista's name and phone number. (DPFOF ¶ 134.)

On or about January 23, 2002, the Fund sent a letter to John Lewitzke which states in pertinent part:

> The Fund faxed and mailed an original request to Erin L. at Sports Performance Center on 11-05-01 asking for physical therapy notes for 9-13-01, 9-18-01 and any subsequent visits. A second request was mailed to Erin's attention on 12-21-01. I also called Erin on two separate occasions and was told that she was away from her desk but a person in the office took a message with my name and phone number. I have never received the courtesy of a call or the medical records from Erin. We cannot proceed with a review on your daughter's physical therapy treatment without complete medical records. If you are able to obtain these records, you may mail them to our office for review. I am closing my file on this matter due to the lack of response from Sports Performance Center.

26

(DPFOF ¶ 135.)

The Lewitzkes sent a letter to the Board of Trustees dated January 31, 2002, enclosing Sports Performance Centers' complete medical records on Brenda Lewitzke from December 15, 2000, through the last day of treatment, September 18, 2001 from the Sports Performance Center. (DPFOF ¶ 136 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

On February 17, 2002, the Fund sent the complete medical records, the Medical Review Institute of America, Inc. (MRI) case assignment form, plan language, PT evaluation, PT discharge summary (March 13, 2001), PT Evaluation (March 27, 2001), and PT progress notes to Medical Review Institute of America, Inc., the Fund's independent medical consultant. (DPFOF ¶ 137.)

The complete medical records sent to MRI included the communications from Dr. Brian Black dated October 19, 2001, and from David Passinault dated October 18, 2001. (DPFOF ¶ 138.)

Dr. Black's letter included in the materials sent to MRI stated the following: "[i]n terms of medical probability and certainty, because of this patient's medical condition, the above named item (physical therapy) is necessary for the patient's treatment and rehabilitation." (DPFOF ¶ 139.)

David Passinault's letter of October 19, 2001 (which is not the same letter referenced in Proposed Finding 138) included in the materials sent to MRI stated the following:

> It is my opinion that physical therapy for Ms. Brenda Lewitzke was medically necessary between the dates of 8/3/01 and 9/18/01 because in that time period, Ms. Lewitzke was making steady progress in the following areas: (1) Advancing her gait pattern from total dependency on 2 canes to needing no assistive devices for short distances up to 50; (2) Improving her balance from the ability to stand independently on level surfaces to uneven surfaces; (3) Improving her weight shifting skills from static standing to moderate trunk excursion away from center of gravity.

(DPFOF ¶ 140 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

27

The following two questions were submitted to Brian Murphy, the medical consultant at MRI regarding Brenda Lewitzkes' medical records: "1. Were visits between 8/3/01 and 9/18/01 medically necessary? 2. Was there over utilization (frequency/duration)?" (DPFOF ¶ 141.)

The Fund Office received the completed report from Medical Review Institute of America, Inc. on or about February 25, 2002. (DPFOF ¶ 142.)

The trustees had already held their meeting for February on February 20, 2002. Therefore, the Lewitzkes' appeal was placed on the trustees' agenda for their next meeting, March 25, 2002. (DPFOF ¶ 143.)

Brian Murphy, an employee of Medical Review Institute of America, Inc. was the consultant who reviewed Brenda Lewitzkes' case file. (DPFOF ¶ 144.)

Brian Murphy, a licensed physical therapist, has a Bachelor of Arts and a physical therapy degree from the University of Puget Sound in Washington and has been in active practice since 1994. (DPFOF ¶ 145.)

Brian Murphy indicated that Brenda Lewitzke had made great functional progress during the course of treatment and concluded the following:

> There is no documentation to support medical necessity of interventions after 8/3/01. Treatment records indicate the interventions being done but over a period of several months there is no functional progress summary or annotations in her records. In the absence of documented functional gain periodically there is no way to determine at what point continued visits are unnecessary. Though this patient was seen for a very long time, based on functional outcome there does not appear to be over utilization until after 8/3/01. Treatment frequency, the interventions chosen, and the function gains of the patient support the utilization. There is no documented evidence of objective, functional status assessment at 8/3/01 to support continued utilization after that date.

(DPFOF ¶ 146.)

28

Brian Murphy stated in his report that the decision to continue to provide skilled physical therapy services must be based on objective, functional needs that must be documented to support continued physical therapy. (DPFOF ¶ 147.)

On March 25, 2002, at the Board of Trustees' Meeting, the trustees denied the Lewitzke's request for physical therapy treatment received August 3, 2001[1] through September 18, 2001, stating "lack of medical necessity" as the reason for such denial. (DPFOF ¶ 148 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

The trustees reviewed the following documents at the Board of Trustees' Meeting on March 25, 2002, which constitutes the entire administrative record:

    a.    The appeal letter from the Lewitzkes dated October 24, 2001, to the Board of Trustees;

    b.    The report from Medical Review Institute of America, Inc., the Fund's independent medical consultant, dated February 25, 2002;

    c.    The report from Innovative Resource Group, the Fund's Case Manager, dated September 28, 2001;

    d.    An Explanation of Benefits (EOB) dated September 5, 2001, from the Fund Office to John Lewitzke;

    e.    A two page letter dated August 15, 2001, from the Fund Office to St. Francis Hospital requesting office notes regarding Brenda Lewitzke;

    f.    A two page letter dated July 26, 2001, from the Fund Office to St. Francis Hospital requesting office notes regarding Brenda Lewitzke.

(DPFOF ¶ 149.)

On April 3, 2002, the trustees sent the Lewitzkes a letter denying their appeal. (DPFOF ¶ 150 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

The letter dated April 3, 2002, from the trustees to the Lewitzkes states in pertinent part:

_____

[1] The defendants' proposed findings of fact state "August 20, 2001," but the relevant underlying documents make reference to "treatment received August 3, 2001 through September 18, 2001."

29

At the most recent meeting of the Board of Trustees of the Milwaukee Carpenter's District Council Health Fund, your request for benefit coverage for Brenda's physical therapy treatment was discussed. I regret to inform you that the Trustees took action to deny your request based on the Fund's medical necessity provision. The Plan provides benefit coverage for medically necessary treatment of an illness or injury. Two separate consultants reviewed the medical records submitted, the Fund's case manager and an independent medical consultant. The medical consultant indicated that there is no documentation to support medical necessity of interventions after August 3, 2001, therefore, the Trustees has no choice but to deny your request. I am sorry that a more favorable decision could not have been made, but the Trustees must adhere to all Plan provisions for all participants in the Fund.

(DPFOF ¶ 151.)

Effective January 1, 2003, Amendment 20 amended Section 7.3 of the Plan Document in relevant part to read as follows:

7.3     Claims Procedures

(a)     Notice of Claim

(1)     Pre-Service Claims

An Eligible Person must obtain precertification from the Family Services Program (FSP) manager for non-emergency inpatient and all outpatient treatment of nervous and mental disorders (including eating disorders), substance abuse, and alcoholism. Also, an Eligible Person must contact the Fund Office for prior approval for all organ transplants. Claims such as this are called "pre-service claims," which means any claim which requires approval of the benefit in advance of obtaining medical care. Claims requiring precertification by the FSP may be submitted initially by telephone. All other claims requiring prior authorization must be submitted in writing to the Fund Office.

*There are special provisions in the Claims Procedure Regulations for "urgent care claim? (referred to under the Plan as "emergencies"), but, by definition, these provisions do not apply because the Plan does not require prior approval of emergency admissions.*

(2)     Post-Service Claims

Any claim for benefits that is not a pre-service claim is considered a "post-service claim." Post-service claims include those for emergency hospital admissions for

Case 2:03-cv-01255-WEC     Filed 08/12/05     Page 30 of 61     Document 79

nervous and mental disorders (including eating disorders), substance abuse, and alcoholism. An Eligible Person must notify the Plan within forty-eight (48) hours following such an emergency admission. An Eligible Person must submit all other post-service claims in writing within ninety (90) days of the occurrence of the accident or sickness, or as soon thereafter as is reasonably possible. In no event (except in the absence of legal capacity) can a claim be submitted later than one (1) year from the date of service.

(DPFOF ¶ 152 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

Effective January 1, 2003, Amendment 20 amended Section 7.4 of the Plan Document in relevant part to read as follows:

7.4     Claims Review and Appeal Procedures

(a)     Pre-Service Claims

The Plan (meaning either the FSP or Fund Office, as applicable) shall notify an Eligible Person whether or not a claim is approved within a reasonable period of time appropriate to the medical circumstances, but not later than fifteen (15) days of the Plan s receipt of the claim. If an Eligible Person shall fail to follow the Plan s procedures for filing a claim, he shall be notified of the failure and the proper procedures as soon as possible, but no later than five (5) days following the failure. The Plan shall notify the Eligible Person verbally, unless the Eligible Person requests the Plan to notify him in writing. If the FSP denies a pre-service claim, the Eligible Person can contact them directly according to their internal review process which shall be stated in the determination letter for reconsideration of the claim. If the Eligible Person is not satisfied with the FSP s determination, he can file a formal appeal to the Fund Office in: writing, subject to the appeal procedures in Section 7.4. For insured organ transplants, the organ transplant insurance company shall notify the Eligible Person directly of its decision. The Eligible Person must appeal directly to the organ transplant insurance company according to its grievance procedures.

The decision by the organ transplant insurance company shall be final and binding.

(b)     Post-Service Claims

The Plan shall notify an Eligible Person of an adverse benefit determination within a reasonable period of time, but not later than thirty (30) days of the Plan's receipt of a claim.

(c)     Pre- and Post-Service Claims

31

If the Plan needs additional time to determine whether a claim is a covered expense for reasons beyond the Plan's control, the Plan may take one fifteen (15)-day extension. The Plan shall notify the Eligible Person prior to the expiration of the initial fifteen (15)-or thirty (30)-day notification period, as applicable, of the circumstances requiring the extension and the date by which the Plan expects to make a decision. If an extension is needed due to an Eligible Person's failure to submit necessary information to decide the claim, the Plan, in the notice of extension, shall specifically describe the required information needed. The time period for making the determination is suspended from the date on which the notice of the necessary information is sent until the date the Eligible Person responds. An Eligible Person has forty-five (45) days from receipt of the notice to respond to the request for information. Once the Eligible Person responds, the Plan shall decide the claim within the fifteen (15)-day extension period. The claim shall be denied if the Eligible Person does not respond in a timely manner. The Plan may take only one (1) extension for group health claims and may not further extend the time for making its decision unless the Eligible Person agrees to a further extension.

(d)     Concurrent Care Claims

A concurrent care claim is a claim that is reconsidered after the Plan has approved an ongoing course of treatment to be provided over a period of time or a number of treatments and the reconsideration results in the reduction or termination of the treatment (other than by Plan amendment or termination) before the scheduled end of treatment. If the Plan shall reduce or terminate treatment before the end of the course of the treatment, the Plan shall notify the Eligible Person far enough in advance of the termination or reduction of treatment to allow him to appeal the adverse benefit determination and obtain a determination on review before the termination or reduction takes effect.

(e)     Disability Claims

The Plan has a reasonable period of time, not in excess of forty-five (45) days, to provide written notice of an adverse benefit determination for any claim for disability benefits under the Plan. The Plan may extend the decision-making period for up to an additional thirty (30) days for reasons beyond the Plan's control, but the Plan shall notify the Eligible Person in writing before the expiration of the forty-five (45)-day period of the reason for the delay and when the decision shall be made. A second thirty (30)-day extension shall be allowable if the Plan still is unable to make the decision for reasons beyond its control. An Eligible Person shall be provided, before the expiration of the first thirty (30)-day extension period, a notice that details the reasons for the delay and the date as of which the Plan expects to render a decision. If an extension is needed because the Plan needs additional information, the extension

32

notice shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and specify the additional information needed to resolve such issues, in which case the Eligible Person shall have forty-five (45) days from receipt of the notification to provide the requested information. The Plan shall issue its decision within thirty (30) days of the date the Eligible Person submits the information [subject to the thirty (30)-day extension previously stated]. The claim shall be denied if the Eligible Person does not submit the requested information in a timely manner.

(f)     When, for any reason, a claim is denied, in whole or in part, the Administrative Manager shall provide the Eligible Employee, Eligible Dependent, Beneficiary, or authorized or legal representatives, as may be appropriate (hereafter referred to as "claimant") with written or electronic notice of adverse benefit determinations within the time frames previously stated. Notices shall containing the following information stated in an easily understandable manner:

(1)     The specific reason or reasons for the adverse benefit determination.
(2)     Reference to specific Plan provisions on which the adverse benefit determination is based.
(3)     A description of additional information, if any, is necessary to perfect the claim and why the material or information is necessary.
(4)     A description of the Plan's claims review and appeal procedures and time limits applicable to such appeal procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review.
(5)     If an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse benefit determination, a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse benefit determination and that a copy of such criterion shall be provided free of charge to the claimant upon request.
(6)     If the adverse benefit determination was based on a medical necessity or experimental treatment, or similar exclusion or limit, an explanation of the scientific or clinical judgment of the Plan in applying the terms of the Plan to the claimant's medical circumstances shall be provided free of charge to the claimant upon request.
(7)     If a medical or vocational expert's advice was obtained on behalf of the Plan in connection with a claim, the claimant may request the identity of the expert, regardless of whether the advice was relied on.

If the claimant feels that the action taken on his eligibility or claim is incorrect, the claimant immediately should ask the Fund Office to review the claim with him. In

Case 2:03-cv-01255-WEC    Filed 08/12/05    Page 33 of 61    Document 79

some cases, the Fund Office may request additional information which might enable
the Fund Office to reevaluate its decision.

(DPFOF ¶ 153 & Pls.' Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

On November 12, 2003, the Lewitzkes commenced this action against the Fund and its
trustees. (DPFOF ¶ 154.)

In their Complaint, the Lewitzkes seek reimbursement in the amount of $3,265.75 expended
for Brenda Lewitzkes' physical therapy between August 4, 2001, and September 18, 2001. (DPFOF
¶ 155.)

The Fund's records indicate that the Fund denied nine sessions of physical therapy between
these dates at a cost to the Lewitzkes of $2,989.75. According to the Lewitzkes, it was ten visits for
which the Fund did not pay. Furthermore, according to the Lewitzkes, they paid $3,263.75 for
physical therapy sessions for which coverage was denied by the defendants. (DPFOF ¶ 156 & Pls.'
Resp. thereto & Defs.' Resp. to Pls.' Resp. thereto.)

The trustees always follow the recommendation of the third-party medical consultants when
deciding questions of medical necessity. And, more particularly in the Lewitzkes' case, the trustees
followed the recommendation of the third-party reviewers on questions of medical necessity. (Pls.'
Additional Proposed Findings of Fact ("PPFOF") ¶ 159 & Defs.' Resp. thereto.)

The statements received by the Lewitzkes from St. Francis Hospital after the trustees' denial
of the Lewitzkes' appeal show that charges for an August 2, 2001 visit were not paid by the Health
Fund. (PPFOF ¶ 160.)

The Plaintiffs assert that the August 2, 2001 visit recorded on the statement from St. Francis
Hospital is actually the August 3, 2001 visit documented in Brenda's medical records. In response,

34

the defendants assert that the plaintiffs have cited no evidence indicating that the August 2, 2001 visit recorded on the statement from St. Francis Hospital is actually the August 3, 2001 visit documented in Brenda's medical records. (PPFOF ¶ 161 & Defs.' Resp. thereto.)

Charges for Brenda's August 3, 2001 physical therapy treatment were not paid by the Health Fund. According to the defendants, no claim was submitted by the Lewitzkes' service provider, St. Francis Hospital, for the August 3, 2001, physical therapy treatment. (PPFOF ¶ 162 & Defs.' Resp. thereto.)

The Lewitzkes paid the hospital $3,263.75 for physical therapy for Brenda that was not covered by the Health Fund. (PPFOF ¶ 163.)

It is important for a third-party consultant charged with reviewing a course of treatment for medical necessity to have all documents and information in front of her before reviewing a patient's file. (PPFOF ¶ 165.)

In order for Susan Spangler to approve a physical therapy session, she needed to see documentation showing "[a]n improvement in functional process." (PPFOF ¶ 168.)

According to Susan Spangler, David Passinault's notes for visit 39 showed only lists of exercises, "but not the quality or quantity" and "nothing objectively documented." (PPFOF ¶ 169.)

According to the plaintiffs, Susan Spangler saw "no documentation of functional improvement" regarding visit 40. In response to this assertion, the defendants assert that Susan Spangler did not see improvement toward the goal of Betsy Lewitzkes' ability to help Brenda follow through with a home exercise program. (PPFOF ¶ 170 & Defs.' Resp. thereto.)

David Passinault's notes for visit 41 state, "L.E. [lower extremity] strength improving. Core strength progressing slowly." (PPFOF ¶ 171.)

35

David Passinault's notes for visit 42 state that that visit was dedicated to "strengthening through movement," among other things. (PPFOF ¶ 172.)

The Plan does not include interest as a benefit recoverable under ERISA § 502(a)(1)(B). (PPFOF ¶ 177.)

The Plan document does not require pre-authorization under any circumstances. (PPFOF ¶ 179.)

The guidelines listed in "CNR's Suggested Guidelines" are still being used to process claims. (PPFOF ¶ 180.)

The materials put before the trustees at the March 25, 2002 meeting did not include any of the medical records, nor did they include the letters from Brenda's treating physician, Dr. Brian Black, and Brenda's physical therapist, David Passinault, which attested to the medical necessity of physical therapy visits 41 through 49. (PPFOF ¶ 182.)

Both Brenda's treating physician and physical therapist found her physical therapy to be medically necessary through her final visit. (PPFOF ¶ 184.)

The Lewitzkes followed all the proper procedures in filing their claims. (PPFOF ¶ 190.)

### III. STANDARDS FOR SUMMARY JUDGMENT

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

Case 2:03-cv-01255-WEC   Filed 08/12/05   Page 36 of 61   Document 79

475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d

927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477

(7th Cir. 1995)).  A mere scintilla of evidence in support of the nonmovant's position is insufficient.

*Id.* (citing *Anderson*, 477 U.S. at 252).

> Thus,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate
> time for discovery and upon motion, against a party who fails to make a showing sufficient
> to establish the existence of an element essential to that party's case, and on which that party
> will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 322.

## IV.  ANALYSIS

### A.  The Applicable Scope of Review

The first question to resolve is the scope of review that this court is to employ in reviewing

the trustees' decisions.  The plaintiffs argue that the court is to grant de novo review.  The defendants

argue that the court should apply the arbitrary and capricious standard of review.

In *Militello v. Central States, Southeast and Southwest Pension Fund*, 360 F.3d 681 (7th Cir.

2004), the court stated that "[a] denial of benefits will be reviewed de novo 'unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan.'"  360 F.3d at 685 (quoting *Firestone Tire and Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989).  "If the plan confers discretionary authority, then a denial of benefits will

be reviewed under an arbitrary and capricious standard."  *Id.*  The court in *Militello* also noted that

previously, in *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000), the Seventh

Circuit had designated the following phrase as safe harbor language that clearly gives the plan

administrator broad discretionary power and thus ensures deferential review: "[b]enefits under this

Case 2:03-cv-01255-WEC   Filed 08/12/05   Page 38 of 61   Document 79

plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Id.* (quoting *Herzberger*, 205 F.3d at 331). However, the court was quick to add that "[w]hile this language ensures deferential review, that precise wording is not required." *Id.* This is because "'the courts have consistently held that there are no "magic words" determining the scope of judicial review of decisions to deny benefits.'" *Id.* (quoting *Herzberger*, 205 F.3d at 331). Finally, in *Militello* the court held that where the trust agreement (which is the document that defines the trustees' authority) confers on the trustees substantially the same discretion as the safe harbor language set forth above, such is sufficient to trigger the arbitrary and capricious standard of review, regardless of whether the language of the plan itself is sufficient to trigger that standard. *Id.* at 685-86. This is because the trust agreement is a plan document under ERISA. In reaching that conclusion the court noted that "trust agreements are mentioned in 29 U.S.C. § 1024(a)(6), (b)(2) & (b)(4), in conjunction with other items that are clearly plan documents." *Id.* at 686 n.2.

In the face of the above-referenced Seventh Circuit precedent, it is my opinion that the standard of review to be employed by this court in reviewing the decision of the trustees in this case is the arbitrary and capricious standard. This is because the Trust Agreement was incorporated into the Plan. More precisely, on page vi of the Plan the following language is found: "[t]his Plan is developed and maintained pursuant to a Restated Trust Agreement effective May 21, 1975, as amended." And, the Trust Agreement language gives the trustees substantially the same discretion as the safe harbor language used in *Herzberger*. Moreover, the Trust Agreement gives to the trustees substantially the same discretion as was given the trustees in *Militello*. *See* 360 F.3d at 685 ("'Trustees are vested with discretionary and final authority in making all [plan-related] decisions, including Trustee decisions upon claims for benefits by participants and beneficiaries of the Pension

39

Fund and other claimants, and including Trustee decisions construing plan documents of the Pension Fund.'") (quoting Article V § 2 of the trust agreement in *Militello*).

To be sure, the Trust Agreement does not contain language which is identical to the language referenced in either *Herzberger* or *Militello*. However, the language in the Trust Agreement makes clear to anyone reading it that "a discretionary determination [by the trustees] is envisaged." *Herzberger*, 205 F.3d at 331. In other words, the language found in the Trust Agreement would provide a reasonable employee with sufficient notice that, while he or she had the right to apply for benefits under the plan, their right to thereafter receive such benefits would be conditioned on the discretion of the trustees. It might therefore be important for that employee to "supplement his ERISA plan with other forms of insurance." *Herzberger*, 205 F.3d at 331; *see also Ruttenberg v. United States Life Ins. Co. in the City of New York*, 413 F.3d 652, 659 (7th Cir. 2005) ("An employee must be told in clear terms that the administrator reserves the authority to construe terms in the plan.") (citing *Herzberger*, 205 F.3d at 333).

More specifically, Section 5.18 of the Trust Agreement provides in pertinent part that:

Subject to the stated purposes of the Fund and the provisions of this Agreement, the Trustees shall have full and exclusive authority to determine all questions of coverage and eligibility, methods of providing or arranging for benefits and all other related matters. They shall have full power to construe the provisions of this Agreement, the terms used herein and the by-laws and regulations issued thereunder. Any such determination and any such construction adopted by the Trustees in good faith shall be binding upon all of the parties hereto and the Beneficiaries hereof.

Furthermore, Section 6.2 of the Trust Agreement provides in pertinent part that:

All questions or controversies, of whatever character, arising in any manner or between any parties or persons in connection with the Trust Fund or the operation thereof, whether as to any claim for any benefits preferred by any Participant, Beneficiary or any other person, or whether as to the construction of the language or meaning of the by-laws, rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with

40

the operation of the Trust Fund or otherwise, shall be submitted to the Trustees or, in the case of questions related to claims for benefits, to an Appeals or Review Committee, if one has been appointed, and the decision of the Trustees or Appeals or Review Committee shall be binding upon all persons dealing with the Trust Fund or claiming benefits thereunder.

Finally, Section 6.3 of the Trust Agreement provides in pertinent part that:

The Trustees may in their sole discretion compromise or settle any claim or controversy in such manner as they think best, and any majority decision made by the Trustees in compromise or settlement of a claim or controversy, or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties interested in this Trust.

Moreover, there is yet a further reason why the arbitrary and capricious standard of review is applicable. On April 1, 2001, Article VII, <u>ADMINISTRATION OF THE PLAN</u>, Section 7.2, <u>Interpretation by Trustees</u>, of the Plan itself was amended to read as follows:

(a) Benefits under this Plan shall be paid only if the Board of Trustees (or its Plan Administrator) decides in its (his) discretion that the applicant is entitled to them.

To be sure, the plaintiffs argue that the above amendment was not effective as to them. This is because:

Defendants did not notify Plan participants of the passage of Amendment No. 5 to the 2000 Restated Plan Document until February of 2003. This was 22 months after Defendants allege that Amendment No. 5 actually took effect. ERISA § 104(b)(1), however, requires that notice of any amendment be given to the participants no later than 210 days after the end of the plan in which the amendment was passed. Because the Health Fund's plan year ends May 31st, Defendants were required by law to provide the Lewitzkes and all other participants notice of the passage of Amendment No. 5 no later than December 27, 2001. This deadline was three months prior to the trustees' denial of the Lewitzkes' appeal at the March 25, 2002 Board of Trustees meeting, which was the first time that the trustees themselves even considered the Lewitzkes' claim. Amendment No. 5 was not effective on April 1, 2001, as alleged by Defendants, and in fact was not effective even on the date of Defendants' final disposition of the Lewitzkes' appeal.

(Pls.' Br. at 2.)

41

Section 104(b)(1) of ERISA, codified at 29 U.S.C. § 1024(b)(1), provides in pertinent part, that "[i]f there is a modification or change described in [section 102(a) and 29 U.S.C. § 1022(a)] . . . a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan." 29 U.S.C. § 1024(b)(1). Section 102(a) of ERISA provides that "[t]he summary plan description shall include the information described in subsection (b)" and "[a] summary of any material modification in the terms of the plan and any change in the information required under subsection (b) . . . shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with [section 104(b)(1) and 29 U.S.C. § 1024(b)(1)]." *Id.* § 1022(a). In turn, section 102(b)(2) of ERISA describes the information that is to be provided in the summary plan. This information includes "the plan's requirements respecting eligibility for participation and benefits; . . . [and] circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *Id.* § 1022(b). ERISA § 102(b) does <u>not</u> include in its list of required information a description of the scope of authority given to the trustees by the plan or by any amendments thereto. Thus, that the plaintiffs may not have received a summary description of Amendment No. 5 within the 210 day limitation period described in ERISA § 104(b)(1) does not affect the effectiveness of that amendment with respect to them.

Indeed, such was the holding of the court in *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317 (9th Cir. 1995). More specifically, in *Atwood*, the court held that the fact that the summary plan description did not state that Newmont had the discretion to determine whether the plaintiff's

42

termination was involuntary (and therefore that he was not eligible for benefits) did not deprive

Newmont of the discretion to do so. 45 F.3d at 1321. Specifically, the court stated as follows:

> We have interpreted § 1022(b) to mean that the SPD "must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished." *Stahl v. Tony's Bldg. Materials, Inc*., 875 F.2d 1404, 1408 (9th Cir. 1989). The language of the SPD in this case amply informed Atwood that there was a danger that he would be ineligible for severance benefits if he resigned. The omission of the plan language placing the determination in the discretion of Newmont does not undermine this conclusion. "The plan's rules should be explained [in the SPD] to permit the ordinary employee to recognize that certain *events* or *actions* could trigger a loss of benefits." *Id.* (emphasis added). The provision in question has no bearing on the *events* or *actions* determinative of eligibility under the plan.

*Id.* at 1321-22; *see also Martin v. Blue Cross & Blue Shield of Virginia, Inc.*, 115 F.3d 1201, 1205

(4th Cir. 1997) ("Vesting the plan administrator with discretion in making coverage decisions simply

does not conflict with the SPD's silence on the matter.").

Given the foregoing, I will review the decision of the trustees in this case under the arbitrary

and capricious standard. According to this standard,

> [a decision of a fiduciary] would be arbitrary and capricious if the [fiduciary] relied upon factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of [its] expertise.

*Kraut v. Wisconsin Laborers Health Fund*, 992 F.2d 113, 118 (7th Cir. 1993) (quoting *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).

In *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 900

F.2d 1138 (7th Cir. 1990), the Seventh Circuit further defined the arbitrary and capricious standard

to be as follows:

> The arbitrary and capricious standard holds that a trustee's decision shall not be overturned on a § 1132(a)(1)(B) matter, absent special circumstances such as fraud or bad faith, if "it is possible to offer a reasoned explanation, based on the evidence,

43

for a particular outcome." "[A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents." Nor will it do so where the trustee has based its decision "'on a consideration of the relevant factors'" that encompass the "'important aspect[s] of the problem.'" before it. If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, *i.e.*, one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

*Exbon*, 900 F.2d at 1142-43 (citations omitted).

## B. Was the Trustees' Decision Arbitrary and Capricious?

In assessing whether the decision of the trustees, to deny the Lewitzkes' claim for payment of Brenda's physical therapy sessions from August 3, 2001 through September 18, 2001, was arbitrary and capricious, I start with the fact that when the trustees made their decision they considered the two independent medical reviews performed by Innovative Resource Group and Medical Review Institute of America, Inc. This is evident from the minutes of the March 25, 2002 meeting, which state as follows:

Mr. Lewitzke requested that the Trustees approve benefit coverage for his daughter's physical therapy treatment after August 1, 2001. Based on two independent medical reviews, the Fund Office denied coverage for treatment received August 3, 2001 through September 18, 2001. The independent reviewers indicated that after August 1, 2001, medical necessity for treatment interventions was not established. Mr. Lewitzke's daughter has cerebral palsy and underwent hamstring-lengthening surgery on March 27, 2001. The Fund paid a total of 40 physical therapy sessions from April 6, 2001 to August 1, 2001.

The first of the independent medical reviewers, Innovative Resource Group (through Case Manager Susan Spangler), submitted a consultation report dated September 28, 2001. That report, which was reviewed by the trustees at their meeting on March 25, 2002, stated, in part, as follows:

Upon receipt of referral, available therapy records were carefully reviewed including physician orders, an initial physical therapy evaluation, a therapy progress summary following 15 initial visits and daily progress notes for visits 19 through 47. Parental concerns regarding reimbursement for continued therapy were addressed

44

telephonically upon receipt of phone inquiry from Brenda's father. Mr. Lewitzke was informed of the therapy review process and of the report process to the client for final determination. Claims history information was obtained from the client for comparison with available records.

Telephonic contact was established with Brenda's primary physical therapist to establish if skilled therapy is continuing and to discuss any indications for continued interventions. Per therapist report, an additional six visits was being recommended to pursue foot orthotic fabrication and to monitor their use.

Based on review of all documentation and discussion with Brenda's primary physical therapist, skilled physical therapy intervention appeared to be indicated for up to 40 total visits. Following Brenda's 40th visit, documentation failed to establish any further functional or objective improvements. As of this visit, Brenda's home exercise program appeared to be fully established and her gross motor function appeared to plateau. A recommendation for foot orthotics was noted at the time of her 37th visit, though no further documentation of this recommendation was noted until her 47th visit on 09/11/01. Though foot orthotics may improve Brenda's gait pattern, the continuation of on-going physical therapy visits up to an additional 6 visits did not appear to be indicated for the purpose of implementing their use.

. . . .

Case management recommends that any claims for physical therapy through the time of Brenda's 40th visit on 08/03/01 be considered for reimbursement as these services appeared to have been indicated. Any claims received after this date should be carefully considered as they do not appear to meet plan guidelines for reimbursement.

(Bulmer Aff. Ex. F.08 at 2.)

The second independent medical reviewer, Medical Review Institute of America, Inc. ("MRI") (through Physical Therapist Brian Murphy), also submitted a report which was reviewed by the trustees at their meeting on March 25, 2002. That report was prepared for the purpose of answering the following two questions: (1) Were visits between 8/3/01 and 9/18/01 medically necessary and (2) Was there over utilization (frequency/duration)?

The MRI report states that the reviewer (who was Murphy) was a physical therapist who was a member of the American Physical Therapy Association; that he had been active in practice since

1994; that he was at that time a rehabilitation manager at a medical center within the community; that he was at that time an Adjunct Faculty and Clinical Instructor at the university level; and that he had participated in presentations and had published articles related to the field of physical therapy. (Bulmer Aff. Ex. F.16 at 2.)

According to the report, the reviewer, i.e., Murphy, had the following documents before him at the time of his review: "the MRI case assignment form, the plan language, PT evaluation, PT discharge summary (3/13/01), PT Evaluation (3/27/01), and PT progress notes." (Bulmer Aff. Ex. F.16 at 1.) The MRI report further states as follows:

> **Explanation of Findings:**
> There is no documentation to support medical necessity of intervention after 8/3/01. Treatment records indicate the interventions being done but over a period of several months there is no functional progress summary or annotations in her records. In the absence of documented functional gain periodically there is no way to determine at what point continued visits are unnecessary.
>
> Though this patient was seen for a very long time, based on functional outcome there does not appear to be over utilization until after 8/3/01. Treatment frequency, the intervention chosen, and the function gains of the patient support the utilization.
>
> **Conclusion:**
> There is no documented evidence of objective, functional status assessment at 8/3/01 to support continued utilization after that date.
>
> **Applicable Clinical or Scientific Criteria or Guidelines Applied in Arriving at Decision:**
> The decision to continue to provide skilled physical therapy services must be based on objective, functional needs that must be documented to support service delivery. In the absence of this information service delivery cannot be supported.

(Bulmer Aff. Ex. F.16 at 1-2.)

The plaintiffs argue that Ms. Spangler's review of the Lewitzkes' claim was "extremely flawed." (Pls.' Br. at 6.) Specifically, according to the plaintiffs, Ms. Spangler admitted "that she did not have all the relevant documents in front of her at the time of her review." (Pls.' Br. at 6.)

46

Furthermore, according to the plaintiffs, Ms. Spangler "admitted to using a standard by which to measure medical necessity that was not in the Plan or the SPD." (Pls' Br. at 7.) This is because she testified that "when reviewing Brenda's physical therapy records, she was looking for 'continued functional and objectively-measurable progress,' and that it was her view that 'maintenance procedures' were not covered by the Plan." (Pls.' Br. at 7.) By doing so, Ms. Spangler "placed the burden on the physical therapist to demonstrate this progress in his notes, a burden which was not in the Plan, and made her decision based on word choices rather than on the well being of Brenda." (Pls.' Br. at 7.) Finally, the plaintiffs argue that Ms. Spangler was inconsistent in how she applied her standard to Brenda's medical records.

As to Brian Murphy, the plaintiffs argue that he

also drew an arbitrary line after 40 visits. He stated in his report, "In the absence of documented functional gain periodically there is no way to determine at what point continued visits are unnecessary." This did not stop him, however, from reaching the finding that "[t]here is no documentation to support medical necessity of interventions after 8/3/01." Mr. Murphy invalidates his own opinion, yet the trustees completely deferred to his report in denying the Lewitzkes' appeal. Again, this illustrates the arbitrariness of Defendants' decision.

(Pls.' Br. at 8-9.)

It is important to recall that I must decide whether the trustees' decision to deny the Lewitzkes' claim was arbitrary or capricious. In other words, it is not the decision of the independent reviewers that is being examined. Thus, the fact that the plaintiffs might be able to parse the third-party reviewers' reports and point out during the reviewers' depositions certain arguable "flaws" in their choice of language does not automatically mean that the trustees' decision to deny the Lewitzkes' claim was arbitrary or capricious. The bottom line is that the trustees' decision to deny the Lewitzkes' claim must be upheld if "it is possible to offer a reasoned explanation, based on the

47

evidence, for a particular outcome." *Exbon*, 900 F.2d at 1142 (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). Stated another way, the trustees' decision must not be set aside if the trustees made an informed judgment and articulated an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached. *See Exbon*, 900 F.2d at 1143.

As noted previously, both of the reviewers opined that physical therapy services beyond August 3, 2001 were not medically necessary. To be sure, Ms. Spangler may not have used that precise language, but Brian Murphy did. And, significantly, at the time of his review of Brenda's records, Brian Murphy had before him the pertinent language of the plan, including the meaning given by the plan to the term "medically necessary." Accordingly, it would have been reasonable for the trustees to place reliance on Murphy's opinion regarding the medical necessity of Brenda's physical therapy visits between August 3, 2001 and September 18, 2001. And, to reiterate, Murphy clearly and unambiguously stated that "[t]here is no documented evidence of objective, functional status assessment at 8/3/01 to support continued utilization after that date." (Bulmer Aff. Exhibit F.16 at 2.) Such being the case, the MRI report alone provided sufficient justification for the trustees' decision to deny the Lewitzkes' claim so as to render such decision not arbitrary and capricious.

This is so even though both Mr. David Passinault (Brenda's physical therapist) and Dr. Brian Black (Brenda's treating physician) believed that physical therapy visits after August 3, 2001, were medically necessary and expressed such views in writing. (*See* Mr. Passinault's letter of October 19, 2001 and Dr. Black's "Statement of Medical Necessity," which were submitted by Mr. Lewitzke to

48

the Board of Trustees along with his letter of October 24, 2001, reproduced in Bulmer Aff. Ex. F.10.) To reiterate, Section 5.18 of the Trust Agreement provides, in pertinent part, that "[s]ubject to the stated purposes of the Fund and the provisions of this Agreement, the Trustees shall have full and exclusive authority to determine all questions of coverage and eligibility, methods of providing or arranging for benefits and all other related matters." Furthermore, on April 1, 2001, Article VII, ADMINISTRATION OF THE PLAN, Section 7.2, Interpretation by Trustees, of the Plan itself was amended to read as follows:

> (a)   Benefits under this Plan shall be paid only if the Board of Trustees (or its Plan Administrator) decides in its (his) discretion that the applicant is entitled to them.

In the face of such language, it is quite clear that the trustees were not bound to accept the opinions of Mr. Passinault and Dr. Black over the opinions of its third-party independent reviewers. To the contrary, the trustees had the discretion to follow and rely upon the opinions of the independent reviewers. And that is what they did.[2]

I get no pleasure in finding that the trustees' decision to deny the Lewitzkes' claim was not arbitrary and capricious. After all, the sum of money expended by the Lewitzkes in paying for Brenda's physical therapy visits from August 3, 2001, to September 18, 2001, was not insignificant. Nevertheless, for all of the reasons set forth above, I am persuaded that the decision of the trustees

───────────────

[2] The Lewitzkes note that in the letter of April 3, 2002, notifying them of the denial of their claim, the following appears: "The medical consultant indicated that there is no documentation to support medical necessity of interventions after August 3, 2001, therefore, the Trustees has no choice but to deny your request." The plaintiffs then proceed to argue that such language demonstrates that the trustees felt that they had no discretion and had to do what the reviewers said to do. I disagree. In my view, that particular choice of language was nothing more than an attempt by the author of the letter, Ms. Sandra Belot, to delicately advise the Lewitzkes of the bad news.

49

must be affirmed.  Accordingly, summary judgment will be granted in favor of the defendants with respect to Count I of the complaint.

## C.  Plaintiffs' Breach of Fiduciary Duty Claim

In Count II of their complaint the plaintiffs seek equitable relief arising from the trustees' alleged breach of their fiduciary duty, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3). In their brief in opposition to the defendants' motion for summary judgment the Lewtizkes more particularly set forth the relief that they are seeking by virtue of the alleged breach:

> The Lewitzkes admit that legal relief, including monetary relief and compensatory damages, is not available to them as relief for their breach of fiduciary duty claim. *See Anweiler*, 3 F.3d at 993.  The Lewitzkes instead seek as equitable relief payment as restitution for the time and money they were forced to expend to bring this case and the previous state case, as well as interest on the money that has been wrongfully withheld from them since September of 2001.  The Lewitzkes are entitled to restitution for the time and expense incurred when they were forced to take legal action due to the trustees' breaches of fiduciary duty.  "[W]hen sought as a remedy for breach of fiduciary duty, restitution is properly regarded as an equitable remedy because the fiduciary concept is equitable." *Bowerman*, 226 F.3d at 592.  They also are entitled to interest on the benefits that they should have been paid in September of 2001.  In *Clair v. Harris Trust & Sav. Bank*, the Seventh Circuit ruled that interest on unpaid benefits is a form of equitable relief in breach of fiduciary duty cases if the plan in question does not classify interest as a benefit in the plan document.  190 F.3d 495, 498-99 (7th Cir. 1999).  The Plan in the instant case does not include interest as a benefit recoverable under ERISA § 502(a)(1)(B) . . . and therefore the Lewitzkes' claim of interest as an equitable form of restitution is appropriate.  The only way to make the Lewitzkes whole and to put them back in the position they were in before the breach by the trustees is to compensate them for the denial of benefits, through either the first or third claims of the Complaint, and for the interest on those benefits and the additional time and resources the Lewitzkes have devoted to fighting for their rights and the rights of all similarly situated Health Fund participants with regard to the administration of the Plan by the trustees.

(Pls.' Br. at 11-12.)

Previously, this court denied the defendants' motion for judgment on the pleadings in which motion they sought dismissal of Count II.  In support of their motion the defendants had argued, *inter*

50

*alia,* that "a party seeking benefits under § 502(a)(1)(B) is not entitled to pursue an action for breach of fiduciary duty founded upon the same benefit denial." (Defs.' Mot. at 2.)

In denying the defendants' motion, this court noted that in *Varity Corp. v. Howe,* 516 U.S. 489 (1996), the Supreme Court opined that the overall structure of ERISA § 502(a) "suggests that [the] 'catchall' provisions [including § 502(a)(3)] act as a safety net, offering appropriate relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." 516 U.S. at 512. In *Varity,* the Supreme Court went on to add that "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515.

This court, relying on the Seventh Circuit's decision in *Clair v. Harris Trust & Savings Bank,* 190 F.3d 495 (7th Cir. 1999), then proceeded to rule as follows:

> In *Clair v. Harris Trust & Sav. Bank,* 190 F.3d 495 (7th Cir. 1999), the Seventh Circuit Court of Appeals confirmed that "only benefits specified in the plan can be recovered in a suit under section 502(a)(1)(B)." *Clair,* 190 F.3d at 497. Such being the case, if interest on benefits that are paid late is not available under the terms of the ERISA plan, then a plaintiff may not sue under § 502(a)(1)(B) to recover such interest. *Id.* However, if the plan does <u>not</u> provide for the payment of interest on such amounts and a plaintiff sues for breach of fiduciary duty, claiming *inter alia* that benefits due him were withheld in violation of the terms of the plan, then he may recover interest on those improperly withheld funds under the provisions of § 502(a)(3)(B). *See Clair,* 190 F.3d at 498-99. This is because, as the court noted, "not all monetary relief is damages. Equity sometimes awards monetary relief, or the equivalent, and restitution is both a legal and an equitable remedy that is monetary yet is distinct from damages." *Id.* at 498.

> To be sure, the parties have not cited to *Clair* in their briefs. Moreover, the plaintiffs have not, at least at this stage, argued that they are entitled to interest on the unpaid benefits to which they claim they are entitled. But, given the Seventh Circuit's holding in *Clair* and given the rather liberal standard to be applied in addressing a motion for judgment on the pleadings, it is my opinion that to dismiss the plaintiffs' breach of fiduciary duty claim at this early stage of the case would be premature. This is so in light of the plaintiffs' allegation in their complaint that they have been "damaged in the form of lost medical benefits and other costs and expenses

51

they incurred.  (Compl. ¶ 41.)  In my view, such language is arguably broad enough
to encompass interest on the "lost medical benefits."

(Decision & Order at 9-10.)

Subsequent to its decision in *Clair*, in *May Department Stores Co. v. Federal Insurance Co.*,
305 F.3d 597 (7th Cir. 2002), the Seventh Circuit cited *Clair* for the proposition that the "wrongful
withholding of benefits due can entitle the beneficiary to impose a constructive trust on interest on
the withheld benefits, an equitable remedy that results in a money payment to the plaintiff."  305 F.3d
at 603.

By withholding benefits, a plan can obtain interest that would otherwise be obtained
by the beneficiary.  That interest is not itself a benefit, and so the beneficiary cannot
bring suit under (a)(1)(B) to recover it.  But he can sue to recover it under (a)(3),
because it is an amount by which the plan has unjustly enriched itself, and unjust
enrichment is a basis, indeed the usual basis, for imposing a constructive trust on a
sum of money.

*Id.*; *see also Jones v. Local 705 Int'l Brotherhood of Teamsters Pension Fund*, 2002 WL 826480,
at *3 (N.D. Ill 2002) ("The relevant case law indicates that in order to recover interest on delayed
benefits under § 502(a)(3)(B) of ERISA, the delay must have been unjustifiable or wrongful.  In other
words, the denial of benefits must have violated the Plan.").

Obviously, the situation at this time is markedly different than it was at the time that the
defendants presented their motion for judgment on the pleadings.  At that time, the plaintiffs still had
pending their claim to recover benefits due them under § 502(a)(1)(B).  For that reason, the court
believed that it would have been premature to dismiss Count II of the complaint.  But, that is no
longer the case.  As stated above, I have found that the plaintiffs are not entitled to benefits from the
Health Plan because the trustees' decision to deny such benefits was not arbitrary and capricious.
And because the plaintiffs are not entitled to the underlying benefits, it follows that they are not

52

entitled to "payment as restitution for the time and money they were forced to expend to bring this case and the previous state case, as well as interest on the money that has been wrongfully withheld from them since September of 2001." (Pls.' Br. at 11.) Such being the case, the defendants' motion for summary judgment seeking dismissal of the plaintiffs' claim for relief under ERISA § 502(a)(3) stemming from the trustees' alleged breach of fiduciary duty will be granted and Count II of the plaintiffs' complaint will be dismissed.

**D. Plaintiffs' Estoppel Claim**

The Seventh Circuit has made clear that "[e]stoppel is at best a difficult theory to use with respect to an ERISA benefits plan." *Davis v. Combes*, 294 F.3d 931, 939 (7th Cir. 2002). Indeed, in *Davis* the court noted (as it had previously done in *Downs v. World Color Press*, 214 F.3d 802 (7th Cir. 2000)) that some circuits do not recognize any application of estoppel principles to modify an ERISA plan, and that even the Seventh Circuit itself had only gone so far as to hold that it *might* apply to an unfunded, single-employer welfare benefit plan. *Davis*, 294 F.3d at 939. Whether estoppel would ever be applicable to other kinds of ERISA plans (such as multi-employer plans like the one involved in this case) is a question that the Seventh Circuit has not yet had occasion to answer directly. Because the Seventh Circuit has left the answer to that question undecided, I am loath to answer it for them. However, even assuming that estoppel were found to be applicable to a multi-employer plan, the undisputed facts demonstrate that the plaintiffs in this case cannot benefit from such legal theory.

In *Downs*, the court identified four elements that must be proved before equitable estoppel will apply: (1) a knowing misrepresentation by the defendants, (2) in writing, (3) with reasonable

53

reliance by the plaintiffs on the misrepresentation, and (4) to the plaintiffs' detriment. 214 F.3d at 805.

The plaintiffs argue that the defendants made "at least two written misrepresentations upon which the Lewitzkes relied in continuing to take Brenda for physical therapy beyond the 40th visit, thereby incurring $3,265.75 in medical expenses that were not reimbursed." (Pls.' Br. at 18-19.) First, they argue that they "relied on the language of the Plan, including the definition of medically necessary and the section stating that medically necessary physical therapy would be covered, in continuing to take Brenda for physical therapy." (Pls.' Br. at 20.) Next, they argue that the

> [d]efendants' second written misrepresentation was their omission of any mention of a pre-authorization requirement in the Plan document. The Plan document was restated in 2000, and although the Health Fund's administrators have had the guidelines requiring pre-authorization for any physical therapy visits beyond the first ten in place since 1999, this was not included in the Restated Plan Document. This policy is illustrated, as discussed above, by the statement on the July 17, 2001 Explanation of Benefits sent to the Lewitzkes. The Lewitzkes relied on the lack of a pre-authorization requirement in the Plan and the SPD in waiting to seek reimbursement for Brenda's medical expenses until after they were incurred. Even though the Lewitzkes followed all the proper procedures in filing their claims, their failure to request pre-authorization undoubtedly delayed the processing of their claim and jeopardized their chances of receiving payment for all of their expenses. Defendants should be estopped from penalizing the Lewitzkes for failing to adhere to an unpublished guideline that is inconsistent with the Plan.

(Pls.' Br. at 20.)

Lastly, the plaintiffs argue that the defendants' course of conduct should estop them from denying the Lewitzkes the benefits allegedly due them under the Plan. More precisely, the plaintiffs argue that

> [d]efendants paid for all of Brenda's physical therapy treatments from December 2000 through February 2001, which were due to general knee pain. Brenda then had hamstring lengthening surgery in March 2001, which was also covered by Defendants. After the surgery, Defendants paid for 13 physical therapy sessions, which occurred in April and May of 2001, without any pre-approval. This was

54

despite Defendants' unpublished policy that participants must request pre-approval for any physical therapy visits beyond ten for a single medical episode. Defendants then paid for visits in June 2001 without reviewing for medical necessity. From this course of payment, it was not only reasonable, but perfectly logical for the Lewitzkes to conclude that Brenda's physical therapy visits would continue to be covered by Defendants, and that the prescriptions from Brenda's treating physician indicating the medical necessity of these treatments would be sufficient to continue coverage. The Lewitzkes relied on Defendants' consistent coverage for these visits in continuing to take Brenda for physical therapy per the instructions of her doctor, and that reliance caused them to incur the $3,263.75 in medical bills.

(Pls.' Br. at 21.)

The plaintiffs' first estoppel argument is predicated on the proposition that the Plan itself contains a misrepresentation; to wit, that the Plan says it will cover "medically necessary" treatment when in fact it will not. But, in my opinion, such a written statement in the Plan cannot constitute a written <u>misrepresentation</u> upon which the plaintiffs claim to have relied to their detriment.

It may be that the defendants' decision to deny payment for Brenda's treatment was, as the plaintiffs assert, not the correct decision. In other words, the plaintiffs may be convinced that Brenda's physical therapy visits after August 3, 2001 were medically necessary and therefore, should have been covered by the Plan. And, indeed, that is the basis for their claim of wrongful denial of benefits as set forth in Count I of the Complaint. But, the plaintiffs have not produced any evidence to support a finding that the trustees knowingly allowed the Plan to <u>falsely</u> state that "medically necessary" treatment would be covered. Stated another way, the plaintiffs have not produced any evidence to support a finding that Section 1.20 of the Plan was a misrepresentation.

Curiously, the plaintiffs' next argue that the "[d]efendants' second written misrepresentation was their <u>omission</u> of any mention of a pre-authorization requirement in the Plan document." (Pls.' Br. at 20) (emphasis added). In other words, the plaintiffs argue that an omission of certain information amounted to a written misrepresentation. Logically, however, an omission cannot

55

constitute a written misrepresentation. Indeed, an omission is the exact opposite of a written misrepresentation; it is the absence of a representation. Such being the case, the plaintiffs' second argument in support of their estoppel theory of liability must be rejected for failure to satisfy the second element of equitable estoppel. *See Downs*, 214 F.3d at 805.

Finally, as stated previously, the plaintiffs argue that the defendants' course of conduct should estop them from denying the Lewitzkes the benefits allegedly due them under the Plan. Once again, however, this theory of liability fails to meet the elements of equitable estoppel as set forth in *Downs*. Simply stated, equitable estoppel (at least in ERISA cases in the Seventh Circuit) generally requires that there be a written misrepresentation. That the plaintiffs may have assumed that their future claims for benefits would be approved based on the fact that their past claims for benefits had been paid (though such assumption might even be reasonable) does not satisfy the first element of estoppel, i.e., that there be a written misrepresentation. To the contrary, this "course of conduct" theory of liability is predicated on the proposition that the plaintiffs relied on the defendants' <u>failure</u> to advise them of certain facts, not on the defendants' having affirmatively and incorrectly represented certain facts to them.

To be sure, the Seventh Circuit has found a basis for application of estoppel in certain limited circumstances involving ERISA plans where there has not been a written misrepresentation. In *Vallone v. CNA Financial Corp.*, 375 F.3d 623 (7th Cir. 2004), the court described that exception as follows:

> In order to prevail on an estoppel claim under ERISA, we ordinarily require that plaintiffs show (1) a knowing misrepresentation; (2) that was made in writing; (3) with reasonable reliance on that misrepresentation by them; (4) to their detriment. *See Coker v. TWA*, 165 F.3d 579 (7th Cir. 1999). However, we have found an exception when plan documents are ambiguous or misleading, in which case oral

56

> representations as to the meaning of the documents may be relevant. *See Bowerman v. Wal-Mart Stores*, 226 F.3d 574, 588 (7th Cir. 2000).

375 F.3d at 639.

But, the limited exception described above is not applicable to the case at bar. First, the Plan documents have not been shown to be ambiguous in any material respect. Furthermore, the plaintiffs have not shown that they relied on any oral representations as to the meaning of any otherwise ambiguous terms in the Plan.

In sum, the plaintiffs have not shown there to be a genuine issue of material fact with respect to their equitable estoppel claim, i.e., Count III of their complaint. Consequently, and for the reasons more particularly set forth above, the defendants' motion for summary judgment on such claim will be granted and the plaintiffs' equitable estoppel claim will be dismissed.

**E. Attorneys' Fees**

ERISA provides that "the court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). District courts entertain a "modest presumption" that prevailing parties are entitled to a reasonable attorneys' fee. *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000) (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 644 (1995)). "This modest presumption, however, is rebuttable." *Id.*

To determine whether a prevailing party is entitled to attorneys' fees, the Seventh Circuit has employed two formulas in ERISA actions. *Id.* Under the first test used in the Seventh Circuit, the court is to look to five factors:

> (1) [T]he degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit

57

conferred on members of the plan as a whole; and (5) the relative merits of the parties' positions.

*Id.* at 592-93 (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)).

Under the second test, the court looks to whether the losing party's position was "'substantially justified.'" *Id.* at 593 (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)). Regardless of which test is used, however, the question asked is essentially the same: "[W]as the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Id.* (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)).

The defendants seek attorneys' fees from the plaintiffs. As the prevailing parties they are entitled to do so. And, as stated previously, there is a modest presumption that they are entitled to be awarded reasonable attorneys' fees. But, that presumption is rebuttable. In my view, the presumption has been rebutted and, for the reasons set forth below, I am denying the defendants' request for attorneys' fees.

To begin, there is no evidence to suggest that the plaintiffs at any time brought this federal lawsuit for the purpose of harassment or in bad faith. To the contrary, this case started as a small claims action in Waukesha County Circuit Court, a small claims action that was commenced by the Lewitzkes *pro se.* In that action the Lewitzkes sought to recover the same unpaid benefits that they sought to recover in the instant case. According to the declaration of Attorney Matthew N. Andres, dated December 30, 2003,

> 4. On May 30, 2003, Frank Locante, one of the Defendants' attorneys in the [small claims] action, appeared for the first time in the small claims matter at a scheduling conference. The Lewitzkes received a Notice of Appearance, which was filed with the court on May 29, 2003, via U.S. mail on May 31, 2003. . . .

58

5.  The Lewitzkes were unrepresented in the small claims case until they were forced to seek legal counsel after Mr. Locante filed a nine page memorandum on the standard of review in an ERISA case. . . . This memorandum was not solicited by the court, and, as is evidenced by the memorandum itself, was filled with numerous case citations and legal references.

6.  Betsy Lewitzke sought the advice and counsel of the attorneys at Foley & Lardner, where she works as a secretary, to review the June 25, 2003 memorandum filed by Mr. Locante and to appear on behalf of her and John at a scheduled July 1, 2003 trial de novo.

7.  On July 1, 2003, while waiting outside the courtroom for the trial de novo, the attorneys for both sides reached an agreement in principle as to a settlement, which caused the court to delay any further proceedings for two months. The court set a scheduling conference for September 8, 2003. At the July 1, 2003 proceeding, Mr. Locante told both the state court judge and me that he would present the proposed settlement agreement at the Health Fund's Board of Trustees meeting, which he said was to occur two weeks later. He then told me that he would thereafter draft the settlement papers necessary to execute the agreement.

8.  Having heard nothing from Mr. Locante since July 1, 2003, I attempted to call him on or about August 12, 2003. I was able to reach his voicemail, and left a message requesting that he call me back to discuss the settlement agreement. I received no return phone call after leaving that message, and I called him again at least once a week for the next four weeks, leaving messages each time I called. In at least one of the messages I offered to draft the settlement agreement that Mr. Locante had told me he would draw up.

9.  Finally, on September 4, 2003, a mere four days before the scheduling conference was to occur, I was able to reach Mr. Locante via telephone. In that conversation, he informed me that the Health Fund trustees had informally rejected the settlement agreement without ever addressing it at a meeting.

10. Both sides were then forced to attend the scheduling conference on September 8, 2003. At that proceeding, the state court erroneously dismissed the small claims denial of benefits case for lack of jurisdiction, basing its finding on ERISA. I objected and directed the court's attention to the statutory section giving the state court concurrent jurisdiction over denial of benefits claims. When asked if he had anything to say regarding my objection, Mr. Locante said he did not.

59

(Andres Decl. ¶¶ 4-10.) It was on the heels of the dismissal of their small clams action that the plaintiffs, now represented by legal counsel, filed the instant federal action seeking recovery of the same benefits that they were trying to recover via the small claims action.

I certainly cannot say that the Lewitzkes' legal position in this action was not substantially justified. To the contrary, it was substantially justified. As noted previously, Brenda's treating physical therapist and her treating physician both opined that her physical therapy visits after August 3, 2001 were medically necessary. It just so happens, however, that the trustees chose to accept the opinions of the third-party consultants, and thus found those particular visits not to be medically necessary.

Furthermore, to impose on the Lewitzkes a judgment for attorneys' fee would not be fair or reasonable. "The Lewitzkes are a middle-class family with two children, one of whom has a disease, the effects of which she will have to battle her entire life." (Pls.' Br. at 23.) To require the Lewitzkes to pay the defendants' attorneys' fees would undoubtedly have a severe, if not devastating, impact on their ability to support their two children.

Consequently, and for all of the foregoing reasons, the defendants' request for attorneys' fees is denied.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that each side bear their own attorneys' fees.

60

**SO ORDERED** this __12th__ day of August 2005, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

61